UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:09-cr-152 |
| v. ) | |
| ) | *Collier / Lee* |
| JAMES R. McCLINTON ) | |

**REPORT AND RECOMMENDATION**

Before the Court is Defendant James McClinton's motion to suppress all evidence recovered from his residence during a search executed on April 13, 2009 [Doc. 19].[1] The parties agree that the only issue presented by the motion is a factual one: whether a search warrant was obtained before Defendant's residence was searched. Based upon the evidence, I find a search warrant was obtained prior to the search. As a result, there was no constitutional violation and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.     BACKGROUND**

    **A.     The Warrant**

The warrant authorizing the search of Defendant's residence was issued by the Honorable Amy Reedy, Judge of the Criminal Court of Bradley County, on April 13, 2009, at 5:07 p.m.[2] The affidavit of Detective David Shoemaker submitted in support of the warrant application states that a 911 call was received at approximately 1:14 p.m. from a residence on Thompson Springs Road. A woman claimed she had been kidnaped the previous evening in Chattanooga, Tennessee, by a man who brought her to a mobile home at 894 Thompson Springs Road, forced her into a bedroom at

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 21]. The Government filed a response in opposition to the motion [Doc. 25] and an evidentiary hearing was held on March 15, 2010.

[2] The warrant and accompanying affidavit were admitted, without objection, as Government's Exhibit 1. Detective Shoemaker testified that the information contained in the affidavit is based on Detective Joe Lee's interview with the victim.

knifepoint, and forced her to remove her clothing at gunpoint. According to Detective Shoemaker's affidavit, the victim stated the man handcuffed her hands and feet and took nude photographs of her, but she escaped the next day when he removed the shackles from her feet. Detective Shoemaker also averred that the homeowner of the Thompson Springs Road residence from which the 911 call was placed confirmed the victim appeared at her home nude and handcuffed. The affidavit stated the landlord advised officers the mobile home at 894 Thompson Springs Road was rented to John Corner, Jr., and the victim identified John Corner, Jr. as the man who kidnaped her.[3] Detective Shoemaker also averred that "deputies secured the property upon arrival and have held the scene since that time."

**B.     Evidence Adduced at the Evidentiary Hearing**

At the hearing, the Government offered the testimony of four officers employed by the Bradley County Sheriff's Office (the "BCSO"). Detective Shoemaker testified as follows: He personally received the call from a 911 dispatcher requesting that a detective to respond to the 911 call. Detective Shoemaker was working on an unrelated matter and instructed Detective Joe Lee to go to the scene. A short time later, Detective Lee returned with the victim to interview her and asked Detective Shoemaker to draft a warrant application. Detective Shoemaker did so, along with Detective Jimmy Woody. Detective Woody then drove Detective Shoemaker to Judge Reedy's home, where she signed the warrant "a little after" 5:00 p.m. Detectives Shoemaker and Woody drove directly to 894 Thompson Springs Road with the warrant, about a 25 to 30 minute drive. This was the first time Detective Shoemaker had been to the scene. Other detectives were also arriving,

---

[3] An electronic request by Detective Jimmy Woody for a photographic lineup containing John Corner, which was admitted without objection as Defendant's Exhibit 1, is dated Apr. 13, 2009, at 2:11 p.m.

and two patrol officers were already on the scene. They knocked on Defendant's door and waited for a response. When there was none, Detective Shoemaker instructed Deputy Timothy Bohannon to force entry.

Deputy Bohannon testified as follows: He was on patrol on the day in question, and he was dispatched to Thompson Springs Road in the "middle of the day" to respond to a possible kidnaping. Deputy Bohannon went directly to the residence where the 911 call originated. He was alone in his patrol car, but Deputy Shane McKee was also responding in his patrol car, and they arrived at the same time--about 2:00 p.m. or a little before. Deputies Bohannon and McKee made contact with the victim, who was very upset, and the person who had placed the 911 call. Several detectives then arrived, and the victim rode with one of the detectives (Deputy Bohannon did not recall which one) as they looked for the residence from which the victim had escaped. When they found it, later identified as Defendant's residence at 894 Thompson Springs Road, Deputy Bohannon pulled into the driveway. Deputy Bohannon was present at Defendant's residence when the first officer got out of his car. The officers attempted to locate the kidnaping suspect, later identified as Defendant. They walked around the residence and knocked on the front and back doors, but did not open either door. There was no indication the suspect was at the residence and, on cross examination, Deputy Bohannon acknowledged the officers were not in hot pursuit. Deputy Bohannon remained parked in the driveway at Defendant's residence until Detective Shoemaker brought a warrant to search the residence sometime around 5:00 p.m. No one entered the residence before the search warrant arrived. After the warrant arrived, Deputy Bohannon knocked on the door and stated the officers had a warrant. As there was no response and the door was locked, Deputy Bohannon made a forced entry into Defendant's residence.

Deputy Shane McKee testified as follows: He received a call in the "middle of the day" to

3

assist a woman who had run to a residence and claimed she had been held against her will. He arrived at the same time as Deputy Bohannon. The victim was nude and handcuffed, and Deputy McKee removed the handcuffs with his key. After Detectives Woody and Lee arrived, the victim got in Detective Woody's vehicle, and they proceeded to Defendant's residence. Deputy McKee stayed in his vehicle and watched the residence. He did not enter the residence, nor did anyone else, before the search warrant arrived.

Detective Woody testified as follows: He, too, was called to the scene in the "middle of the day." After speaking with the victim, she accompanied him in his car to find the residence from which she escaped. They located it after "several minutes" and pulled into the driveway. Detective Woody did not enter the residence at that time. The victim was placed in a different car. After not more than half an hour, Detective Woody returned to the BCSO. He later accompanied Detective Shoemaker to Judge Reedy's house to obtain a search warrant and then went back to the residence, at which time the warrant was executed.

Defendant also called four witnesses: two neighbors, a crime scene technician for the BCSO, and a computer examiner for the BCSO. Mrs. Trudy Jeannette Beck, one of the neighbors, testified as follows: Her husband owns the property at 894 Thompson Springs Road, and her father-in-law rents that property and receives the rental income. She also lives on Thompson Springs Road, within sight of Defendant's residence. She knew Defendant only as "John," and did not know his last name on the day the search took place. When Mrs. Beck arrived home that day, she saw a patrol car parked in Defendant's driveway. Mrs. Beck spoke with the officer in the parked car briefly to ask what was going on. After several hours, she saw other police cars arrive at the residence. Mrs. Beck took several pictures of the officers in Defendant's yard and on his porch. The pictures bear

4

a date stamp of April 13, 2009, and time stamps ranging from 4:42 to 4:45 p.m.[4] Mrs. Beck did not recall ever setting the date and time stamping function on her camera, but stated her children have played with it and may have set the date and time. When asked whether she had previously told the state prosecutor she believed the time stamps on the photographs to be correct, Mrs. Beck testified that, to the contrary, she told the prosecutor she believed the time stamps were incorrect.

The other neighbor to testify, Ms. Avis Wojick, who also resides on Thompson Springs Road within sight of Defendant's residence, testified as follows: She watched officers enter Defendant's residence between 3:00 and 4:00 p.m. She was confident of that time range because her clock "dings every hour." She did not recall exactly how many officers entered the residence, but stated there were "a bunch." She did not see the officers serve a search warrant when they entered the residence. Defendant showed Ms. Wojick one of Mrs. Beck's photographs, in which several officers are standing on Defendant's porch. Ms. Wojick stated the photograph accurately depicted the scene when she saw the officers entering Defendant's residence. On cross examination, Ms. Wojick stated she had never told anyone what time she saw the officers enter Defendant's residence because no one had ever asked her. She admitted she is friendly with Defendant's sister, but stated she was not asked by Defendant's sister to testify.

Defendant called a BCSO crime scene investigator, Detective Laura Lane, who testified as follows: Her duties include taking photographs at crime scenes. She took pictures at Defendant's residence using a digital camera which belongs to the BCSO and stays in the government vehicle she drives. Another crime scene investigator, Detective Emily Hamstra, had been called earlier to

---

[4] Without objection, these photographs were marked as Defendant's collective Exhibit 2. The above-referenced time stamps correspond to the photographs marked as numbers 4, 5, and 6.

take photographs of the victim. Detective Lane identified the photographs she took from that day, and observed that they did not bear a visible time or date stamp.

Detective Dewayne Scoggins, the final witness called by Defendant, testified as follows: He is a polygraph examiner and computer examiner for the BCSO. After receiving a subpoena for metadata for the cameras and photographs taken in this case, he obtained photographs stored on a compact disc and the camera's memory card. Detective Scoggins explained that each digital image also has "metadata," or "information about information," associated with it. This metadata includes information like date, time, aperture, and the manufacturer of the camera. The metadata is created by the camera, and is only as accurate as the setting of the camera's date and time function. The photographs taken by Detective Lane, including photographs from the scene and others taken later in the forensics laboratory, bear a date stamp of February 4, 203, and two distinct sets of time stamps: from 1:14:11 until 2:21:28, and from 16:45:33 until 21:07:00.[5] The photographs of the victim taken by Detective Hamstra (with a different camera) bore a date stamp of April 13, 2009, with times between 13:52:08 and 13:53:54.[6]

In rebuttal, the Government recalled Detective Shoemaker. He was presented with the photograph of the officers on Defendant's porch – the photograph that, according to Ms. Wojick, accurately depicted the scene when the officers entered Defendant's house between 3:00 and 4:00 p.m. Detective Shoemaker identified himself in that photograph and others and testified that the

---

[5] The metadata and images of the crime scene were admitted, without objection, as Defendant's Exhibit 3. There were other pictures and metadata admitted in this exhibit which bear date stamps of February 11 and 12, 2003.

[6] The metadata and images of the victim were admitted, without objection, as Defendant's Exhibit 4.

folded white paper protruding from his back pocket in the photographs was the search warrant.

## II.     ANALYSIS

The fruits of a search will not be suppressed unless there was some constitutional violation, *Hudson v. Michigan*, 547 U.S. 586, 592 (2006), and a search which is authorized by a valid warrant satisfies the Fourth Amendment's requirements. U.S. CONST. amend. IV. It is undisputed that the search warrant was properly issued at 5:07 p.m. At issue is when the search began.

Defendant argues the Government has failed to meet its burden of proof to show the search was not executed until after the warrant was obtained.[7] Defendant relies on Ms. Wojick's testimony, the time stamps on Mrs. Beck's photographs, and the metadata associated with the images taken by Detective Lane, to argue that the search preceded the warrant. The evidence, however, weighs heavily against Defendant's argument.

First, the metadata and camera time stamps are not reliable evidence. The metadata associated with the images taken by Detective Lane show they were taken on February 4, 2003, beginning at 1:14 (presumably in the morning, since the times are in military format). Defendant conceded that the date was incorrect, but argued the times might nonetheless be correct. Contrary to Defendant's position, the likelihood that these times are accurate is, at best, remote. And with respect to the time stamps on Mrs. Beck's photographs, Mrs. Beck testified she had not set the camera's clock and did not know if it was accurate, and she previously told a state prosecutor that she believed the times on the photographs were inaccurate.

---

[7] The Government did not dispute, or even address, Defendant's claim the Government bears the burden of proof. Given the strong evidence the search warrant was obtained prior to initiation of the search of Defendant's residence, the Court accepts, without deciding, that the Government bears the burden of proving the warrant was obtained prior to initiation of the search.

Second, all three pieces of evidence on which Defendant relies are in conflict. Ms. Wojick testified that Mrs. Beck's photographs accurately depicted the scene as officers entered Defendant's residence, but Mrs. Beck's photographs show officers preparing to enter Defendant's residence between 4:42 and 4:45 p.m., while Ms. Wojick testified that the entry occurred prior to 4:00 p.m. Thus, assuming that Mrs. Beck's camera was set to the correct time, the time stamps contradict Ms. Wojick's testimony, and vice versa. Similarly, the metadata from Detective Lane's photos is not consistent with either the time stamps on Mrs. Beck's photographs or Ms. Wojick's account.

Third, the pictures taken by Mrs. Beck (pictures, it bears repeating, Mrs. Wojick stated accurately depicted the scene as the officers entered Defendant's residence) show Detective Shoemaker in Defendant's yard and on his porch. Detective Shoemaker, according to the warrant signed by Judge Reedy, appeared in person to apply for the warrant, and it is hard to believe he could have been at Defendant's residence at 4:45 p.m. and at Judge Reedy's home at 5:07 p.m. when the two locations are separated by a 25 to 30 minute drive. This further undermines the accuracy of the time stamps on Mrs. Beck's photographs. Moreover, the warrant is protruding from Detective Shoemaker's pocket in the photographs, casting further doubt on Ms. Wojick's account.

Finally, and significantly, each officer credibly testified that no one entered Defendant's residence until Detective Shoemaker arrived with the warrant. Deputies Bohannon and McKee, in particular, testified they observed Defendant's residence from the time the first officer arrived until the warrant was executed, and no one entered the residence during that time. Mrs. Beck testified that she spoke with an officer in the driveway, corroborating this testimony. As the Government pointed out in its argument, Defendant has offered no reason to believe the officers secured the premises, waited in the driveway for some time, and then proceeded to enter the residence without

a warrant.

After considering all of the evidence, I **FIND** the officers secured a search warrant before entering and searching Defendant's residence. Defendant has asserted no alternative ground justifying suppression, and, therefore, I **CONCLUDE** the evidence discovered during the execution of the properly issued search warrant should not be suppressed.

## III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[8] that Defendant's motion to suppress [Doc. 19] be **DENIED**.

> s/Susan K. Lee
> SUSAN K. LEE
> UNITED STATES MAGISTRATE JUDGE

---

[8] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).